UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

J. Refugio Garcia and Isabel
Garcia, husband and wife,

       Plaintiffs,

v.                                       Civil No. 09-83 (JNE/AJB)
                                       ORDER

City of St. Paul; Officer Kathleen Brown,
badge # ___, personally, and in her capacity
as a St. Paul police officer; Officers Jane Doe,
John Doe, Jane Roe, and Richard Roe, unknown
and unnamed St. Paul police officers; and John M.
Harrington, chief of police, personally, and in his
official capacity,

       Defendants.

---

Albert T. Goins, Sr., Esq., Goins Law Offices, Ltd., appeared for Plaintiffs.

Portia M. Hampton-Flowers, Esq., St. Paul City Attorney, appeared for Defendants.

---

      This action arises from an altercation in the early morning hours of December 31, 2006,

between J. Refugio Garcia (Refugio) and at least four St. Paul police officers: Kathleen Brown,

Dustin Ator, Joseph Higgins, and Kevin Sullivan.  Refugio and his wife, Isabel Garcia (Isabel),

filed a Complaint in state court dated December 24, 2008.  In the Complaint, Refugio asserts

claims against Brown and four unknown and unnamed St. Paul police officers in their personal

and official capacities for violations of the Fourth, Fifth, and Fourteenth Amendments to the

United States Constitution under 42 U.S.C. § 1983 (2006); for "conspiracy to refuse to vindicate,

protect or to not infringe the constitutional rights of Brown skinned and Latino-American

persons in the City of St. Paul" pursuant to 42 U.S.C. § 1985 (2006); and for assault, battery,

intentional infliction of emotional distress, and negligent infliction of emotional distress under

state law.  Isabel asserts claims for intentional and negligent infliction of emotional distress

against Brown and the four unknown and unnamed St. Paul police officers. Plaintiffs also allege

that the City of St. Paul (City) is vicariously liable for the alleged torts committed by Brown and

the four unidentified St. Paul police officers. Finally, the Complaint asserts municipal liability

claims against the City and John M. Harrington, the City's chief of police, pursuant to 42

U.S.C. § 1983.

Defendants removed the action to federal court on January 15, 2009, and moved for

summary judgment on March 1, 2010. Two weeks later, Plaintiffs moved to amend the

Complaint to name Ator, Higgins, and Sullivan as defendants. On April 5, 2010, the magistrate

judge denied Plaintiffs' motion. Plaintiffs appealed the magistrate judge's Order on April 19,

2010. The Court now considers Plaintiffs' appeal of the magistrate judge's Order and

Defendants' Motion for Summary Judgment. For the reasons discussed below, the Court affirms

the magistrate judge's Order and grants in part and denies in part Defendants' Motion for

Summary Judgment.

## I.        BACKGROUND[1]

After drinking an unspecified quantity of beer at work after his shift ended and two beers

at home, Refugio went to a bar around 10:00 p.m. on December 30, 2006,[2] where he consumed

three more beers and "two drinks." Refugio drove home around 2:00 a.m. This required driving

north less than one mile on Rice Street, turning right onto Front Avenue, and continuing for less

than one block to his home on the south side of the street. Refugio testified that he had parked

---

[1]      The Court sets forth the facts in the light most favorable to Plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2]      Refugio testified in his deposition that he went to the bar on the night of December 31, 2006. The actual date, however, is immaterial, and all of the other evidence indicates that it was the night before.

on Rice Street at the bar and turned only upon reaching Front Avenue, that he drove "normal," and that, as he pulled into his driveway, his foot "slipped" and caused the car to "jump[]."

Meanwhile, Brown was engaged in a traffic stop on Rice Street just south of Front Avenue. Brown testified that while she was outside of her squad car speaking with the driver of the detained vehicle, she heard a vehicle rev its engine and squeal its tires. She then observed a vehicle stop in the middle of Rice Street fifty to one-hundred feet behind her squad car, rev its engine, and move toward her at a high rate of speed. According to Brown, the car swerved around her and made a quick right turn onto Front Avenue.[3] She immediately aborted her traffic stop and pursued the vehicle with her emergency lights on but without a siren, intending to arrest the driver for reckless driving.

Refugio arrived at his home and parked his car in the driveway. As Refugio exited the car, Brown arrived and confronted him. Refugio attempted to enter his home through the back door and was told by Brown to return to his vehicle. During this interaction, Brown smelled alcohol on Refugio's breath. Instead of returning to his vehicle, Refugio entered his home through the back door. Brown followed him inside despite Isabel's attempt to close the door.[4]

_____

[3]    Refugio testified that he did not recall revving his engine while driving on Rice Street or seeing a squad car near the corner of Rice Street and Front Avenue. He did not, however, deny that he revved his engine or that a squad car was present. Refugio also did not deny stopping on Rice Street before reaching Front Avenue. Rather, he responded to the question of whether he stopped on Rice Street by stating, "I didn't have a reason [to stop]." The Court therefore accepts Brown's testimony as true with respect to these matters.

[4]    Refugio testified in his deposition that he returned home, exited his car, entered his home through the back door, and walked through the laundry room and into the kitchen where he retrieved a beer from the refrigerator. He testified that nobody was in his driveway when he exited his car and entered his home. Isabel testified that she observed a police squad car arrive and park in front of the house one minute after Refugio had parked his car in the driveway and after he had entered the home. According to Refugio, he heard a knock at the back door twenty or thirty seconds after entering his home. He opened the back door, where the only illumination came from the kitchen light, and heard a woman say "hey, come here." Refugio testified that he

3

Brown then grabbed Refugio's arm. Refugio responded by pulling back and yelling for Isabel to call the police. Brown held onto Refugio's back as he retreated, and he dragged her from the laundry room through the kitchen and into the living room at the front of the house. During this struggle, Refugio refused to be handcuffed by Brown and Brown attempted to subdue Refugio by kicking his knees, striking him with her fists, and attempting to pull his arms behind his back.

Refugio and Brown ended up on or near the sofa in the living room where Brown continued to punch Refugio. At this point, Brown called for backup and Isabel called 911. Refugio then ran to a bedroom adjacent to the living room. Brown and Refugio continued the altercation in the bedroom until Ator, Higgins, and Sullivan arrived shortly after Brown called for backup. Upon their arrival, Brown testified that she pushed Refugio toward them and thereafter had no additional physical contact with him. Ator, Higgins, and Sullivan tackled Refugio to the floor. While on the floor, Refugio kept his hands underneath him to prevent the officers from handcuffing him. As Refugio tried to push himself up, he was struck on the head. Ator, Higgins, and Sullivan struck him multiple times on his shoulders and back with their

---

could not see Brown well because of the limited light. As a result, although Brown was wearing a police uniform, Refugio did not recognize her as a police officer and she did not identify herself as a police officer. Refugio further testified that after he opened the back door, Brown allegedly grabbed him and tried to pull him outside, at which time his physical altercation with Brown commenced. These portions of Refugio's and Isabel's deposition testimony directly contradict the allegations in the Complaint. Accordingly, the Court, as it must, disregards the inconsistent testimony and states the facts as alleged in the Complaint. *See Nat'l Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 886 (8th Cir. 2001) ("'Factual statements in a party's pleadings are generally binding on that party unless the pleading is amended.'" (quoting *Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001))); *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990) (holding that "admissions contained in pleadings are binding where . . . the admitting party later produced evidence contrary to those admissions."). *But cf. Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (adopting deposition testimony that contradicted earlier sworn testimony for purposes of summary judgment).

flashlights.[5]  Higgins also sprayed pepper spray in Refugio's face.  While on the floor in the bedroom, Refugio lost consciousness.  When Refugio regained consciousness, he was in the snow in the front of his home and the police officers were "putting pepper in [his] nose," placing their fingers in his nose and pulling his nostrils upward, opening his mouth, hitting him, and telling him to wake up.

Higgins transported Refugio to jail in a squad car to be photographed and to have his fingerprints taken.[6]  Refugio complained of being in pain while he was being fingerprinted, but was told by an officer that he was "crazy . . . for hitting a female police officer" and that he had no rights because he was in custody.  Refugio was then transported to a hospital where his blood was drawn without his approval at the direction of an unknown police officer.  Brown's incident report indicated that Refugio was arrested for the primary offense of obstructing the legal process and the secondary offense of second-degree refusal to submit to testing for driving while under the influence.  There is no evidence that Refugio was prosecuted for those offenses.

At the time of his release from jail, Refugio had bruising on his legs, arms, back, and neck and was bleeding from the back of his head.  In addition, he had temporarily lost vision in one eye.  Isabel took him to the hospital the day after his release where it was determined that he had two broken ribs.  Refugio also received treatment for irritation to his eyes caused by the pepper spray.  He continues to experience cramps in his side, blurred vision, headaches, and

---

[5]    Isabel testified that she saw eight or nine different police officers hitting Refugio with their flashlights while he was on the ground.  Higgins stated in his supplemental incident report that he hit Refugio in the left shoulder area "several times" with his flashlight.  Ator stated in his supplemental incident report that he made "multiple strikes" to Refugio's right shoulder to get him on the ground.  Sullivan stated in his deposition that he struck Refugio one time in the upper right arm.  Sullivan also noted that the St. Paul Police Department authorizes officers to use flashlights as "weapon[s] of opportunity" against individuals resisting arrest.

[6]    Ator and Sullivan injured their hands during the altercation and went to the hospital for treatment.

nervousness as a result of the December 31, 2006, incident and the injuries he sustained. Isabel, who observed the entire incident, testified that her memories of the incident caused her to cry and lose sleep regularly in the months following the incident.

## II.    DISCUSSION

### A.    Appeal of the magistrate judge's Order

On February 19, 2009, Defendants provided Plaintiffs with the names of every police officer at the scene of the December 31, 2006, incident. One week later, the magistrate judge issued the Pretrial Scheduling Order, which required service of motions to amend the pleadings by May 1, 2009, and set an October 1, 2009, deadline for the completion of discovery and the filing and service of nondispositive motions. An August 26, 2009, Amended Pretrial Scheduling Order extended the deadline for completing discovery and filing and serving nondispositive motions until January 1, 2010, but did not extend the deadline for serving motions to amend the pleadings. Plaintiffs obtained the police reports of Ator, Higgins, and Sullivan on August 31, 2009. On December 15, 2009, Plaintiffs moved to extend discovery to allow them to depose Ator, Higgins, and Sullivan. The magistrate judge granted the motion on January 4, 2010, permitting Plaintiffs a total of three hours to depose the three officers on or before January 31, 2010. Ator and Sullivan were deposed on January 22, 2010, and Higgins was deposed on January 27, 2010. On March 16, 2010—more than one year after learning that Ator, Higgins, and Sullivan were present at the December 31, 2006, incident; nearly eleven months after the deadline for motions to amend the pleadings had passed; more than six months after the police reports were disclosed to Plaintiffs; almost two months after Plaintiffs deposed the officers; and only after Defendants moved for summary judgment—Plaintiffs moved to amend the Complaint to add Ator, Higgins, and Sullivan. On April 5, 2010, the magistrate judge denied Plaintiffs'

Motion to Add Named Parties because they had not shown good cause for the late-filed motion and Ator, Higgins, and Sullivan would be prejudiced if added as defendants so late in the litigation process. This decision was neither clearly erroneous nor contrary to law. *See* Fed. R. Civ. P. 16(b)(4) (good cause required to modify pretrial scheduling order); *Ringsred v. City of Duluth*, 187 F. Supp. 2d 1141, 1146 n.5 (D. Minn. 2001) (noting that after expiration of scheduling order's deadline for amending the pleadings, "the propriety of a [m]otion for leave to amend is most properly considered within the framework of Rule 16(b), Federal Rules of Civil Procedure." (quotation marks omitted)); *see also* 28 U.S.C. § 636(b)(1)(A) (2006) (standard of review); Fed. R. Civ. P. 72(a) (same); D. Minn. LR 72.2(a) (same). Accordingly, the Court affirms the magistrate judge's Order.[7]

## B.     Motion for summary judgment

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant

---

[7]     The assertion of claims against unknown defendants is appropriate in a federal action so long as the complaint contains allegations supporting a reasonable likelihood that the identities of the unknown defendants will be discovered during the litigation process. *See Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) ("[A]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery."). Upon discovery of the previously unknown defendants, a plaintiff generally may amend his complaint to add them. *See Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985). Plaintiffs' failure to timely move to add Ator, Higgins, and Sullivan as defendants, however, precludes their addition to this action. Accordingly, Plaintiffs' claims against the four unknown and unnamed police officers are dismissed without prejudice. *See Phelps v. United States Fed. Gov't*, 15 F.3d 735, 739 (8th Cir. 1994) (affirming district court's dismissal without prejudice of the "unknown defendants").

satisfies its burden, the party opposing the motion must respond by submitting evidentiary

materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2);

*see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining

whether summary judgment is appropriate, a court must look at the record and any inferences to

be drawn from it in the light most favorable to the party opposing the motion. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

       1.     *Section 1983 claims*

      Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States . . . to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. Refugio asserts § 1983 claims against Brown in her individual and official

capacity, Harrington in his individual and official capacity, and the City.[8]

       a.     *Claims against Brown in her individual capacity*

      Refugio alleges that Brown violated the Fourth Amendment by entering his home to

arrest him without probable cause or exigent circumstances and by using excessive force in

attempting to effectuate the unlawful arrest.[9] Brown maintains that Refugio's claims are barred

---

[8]      The claims against Brown and Harrington in their official capacities are merely claims against the City itself. *See Jenkins v. County of Hennepin*, 557 F.3d 628, 631 (8th Cir. 2009). Additionally, Plaintiffs have identified no facts or arguments supporting a constitutional violation by Harrington in his individual capacity.

[9]      Refugio did not respond to Defendants' arguments that summary judgment is warranted on his substantive due process claim under the Fifth and Fourteenth Amendments. Because the "physically intrusive governmental conduct" Refugio complains of arose "in the context of an arrest or investigatory stop," his claims are governed by the Fourth Amendment instead of "the more generalized notion of 'substantive due process.'" *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Accordingly, summary judgment is warranted on Refugio's substantive due process claim.

by qualified immunity. The doctrine of qualified immunity protects state actors from civil liability when "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A plaintiff overcomes the defense of qualified immunity by showing that: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quotation marks omitted). A court may "'exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)). "[T]he qualified immunity question requires [a court] to assess the facts as they appeared to the officers." *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994).

### i. Warrantless entry

"It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). An officer is entitled to qualified immunity for an arrest unsupported by probable cause so long as she had "arguable probable cause" to make the arrest. *Id.* (quotation marks omitted). It is also clearly established that an officer's entry into a home to make an arrest without a warrant requires exigent circumstances in addition to probable cause. *Greiner*, 27 F.3d at 1353; *see also Payton v. New York*, 445 U.S. 573, 590 (1980); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998). An officer is entitled to qualified immunity as long as she had a reasonable, even if mistaken, belief that "exigent circumstances were present based upon the information [s]he

possessed at the time" of the warrantless entry. *Rogers v. Carter*, 133 F.3d 1114, 1119 (8th Cir. 1998).

Brown argues that she had probable cause or arguable probable cause to arrest Refugio for the misdemeanor offenses of reckless driving and driving while impaired. *See* Minn. Stat. §§ 169.13, subd. 1(a) (2008) (reckless driving), 169A.20, subd. 1 (2008) (driving while impaired).[10] "Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Baribeau*, 596 F.3d at 474 (quotation marks omitted). In this case, Brown's personal observation of Refugio's erratic driving gave her probable cause to arrest him for reckless driving at the time she confronted him in his driveway. *See* Minn. Stat. § 169.13, subd. 1(a) ("Any person who drives any vehicle in such a manner as to indicate either a willful or wanton disregard for the safety of persons or property is guilty of reckless driving."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Additionally, after smelling alcohol on Refugio's breath and observing him retreat into his home, Brown had probable cause to believe that he had been driving while impaired.[11] *See Schmerber v. California*, 384 U.S. 757, 768-69

---

[10]  First-degree driving while impaired in Minnesota is a felony. *Id.* § 169A.24. Second- and third-degree driving while impaired are gross misdemeanors, *id.* §§ 169A.25, 169A.26, and fourth-degree driving while impaired is a misdemeanor, *id.* § 169A.27. Brown does not argue that she had probable cause or arguable probable cause to arrest Refugio for first-degree driving while impaired.

[11]  Because Brown had probable cause to arrest Refugio for reckless driving and driving while impaired, the Court does not address whether Refugio's flight gave her arguable probable cause to arrest him for obstructing, resisting, or interfering with her performance of official

(1966) (finding probable cause to arrest for driving under the influence of alcohol based on smell of alcohol on defendant's breath and eyes that "were bloodshot, watery, [and] sort of glassy [in] appearance"); *United States v. Barry*, 98 F.3d 373, 377 (8th Cir. 1996) (finding probable cause for driving while intoxicated based on suspect's erratic driving, admission of alcohol consumption, and failure of sobriety tests); *United States v. Rehkop*, 96 F.3d 301, 305 (8th Cir. 1996) (finding probable cause for driving while intoxicated because suspect sat at a stoplight in his vehicle through three rotations before moving, weaved within his own lane four times, and ran a red light); *see also United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2008) ("Evasive behavior, while not alone dispositive, is another fact supporting probable cause."); *Kelly v. Bender*, 23 F.3d 1328, 1330 (8th Cir. 1994) ("We further conclude that the officers' preexisting reasonable suspicion coupled with [the suspect's] flight constituted arguable probable cause to arrest [the suspect] for disorderly conduct.").  Therefore, Brown is entitled to qualified immunity on Refugio's illegal entry claim if exigent circumstances existed at the time of her entry into Refugio's home.

   "Exigent circumstances include threats to an individual's life, a suspect's imminent escape, the imminent destruction of evidence, or situations where there is a compelling need for official action and there is no time to secure a warrant."  *Smith v. Kansas City, Mo. Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009) (quotation marks omitted).  Here, no evidence indicates that someone's life was threatened or that Refugio's escape was imminent, and the need to preserve Refugio's blood-alcohol level did not justify Brown's warrantless home entry.  *See Patzner v. Burkett*, 779 F.2d 1363, 1368 (8th Cir. 1985).  Nevertheless, "the hot pursuit of a fleeing suspect

---

duties in violation of Minn. Stat. § 609.50, subd. 1(2) (2008).  *See State v. Morin*, 736 N.W.2d 691, 698 (Minn. Ct. App. 2007) (holding that fleeing a police officer without directing physical activity at the officer to obstruct the investigation does not violate Minn. Stat. § 609.50, subd. 1(2) (2004)).

can [also] be an exigent circumstance justifying a warrantless arrest in one's home." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005) (citing *Minnesota v. Olson*, 495 U.S. 91, 100-01 (1990)).

The hot pursuit doctrine, which precludes a suspect from "defeat[ing] an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place," *United States v. Santana*, 427 U.S. 38, 43 (1976), requires evidence of an "immediate [and] continuous pursuit of the [suspect] from the scene of a crime," *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). The undisputed facts in this case show that Brown immediately and continuously pursued Refugio from the moment Refugio's car passed her on Rice Street until she entered Refugio's home. Before entering Refugio's home, Brown smelled alcohol on his breath and had probable cause to believe that he had committed the offense of driving while impaired. As a result, Brown's entry into Refugio's home was lawful unless the law imposes a categorical prohibition on warrantless home entries based on probable cause to arrest for the misdemeanor offense of driving while impaired.[12] As discussed below, the Court need not decide this issue because, even if the law prohibits such warrantless home entries, that law was not clearly established in December 2007.

A warrantless home entry to arrest an individual suspected of committing a minor crime requires a greater showing of exigency than a warrantless home entry to arrest an individual suspected of a more serious crime. *See Welsh*, 466 U.S. at 753; *Patzner*, 779 F.2d at 1370. Pursuant to this proportionality requirement, "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Welsh*, 466 U.S. at 753. The United

---

[12] The Court's inquiry focuses on the more serious of the two crimes for which Brown had probable cause to arrest Refugio.

States Supreme Court in *Welsh*, however, declined "to consider whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for certain minor offenses," *id.* at 749 n.11, and no later precedent from the Supreme Court or the United States Court of Appeals for the Eighth Circuit has held that police officers are categorically prohibited from entering a suspected misdemeanant's home without a warrant in hot pursuit of the suspect. To the contrary, although the Eighth Circuit has indicated that *Welsh* "casts serious doubt on the question of whether a warrantless home arrest for a misdemeanor will ever be deemed reasonable," the court in *Greiner* nevertheless refused to hold that the warrantless home entry by police officers in hot pursuit of suspected misdemeanants violated clearly established federal law. *See Greiner*, 27 F.3d at 1353-54. Furthermore, the Minnesota Supreme Court held after *Welsh* that "an officer in hot pursuit of a person suspected of the serious offense of driving under the influence of alcohol may make a warrantless entry into the suspect's home in order to effectuate an arrest." *State v. Paul*, 548 N.W.2d 260, 267 (Minn. 1996). Although Minnesota state law is not binding in this § 1983 action, absent a clear statement from the United States Supreme Court or the Eighth Circuit undermining the holding in *Paul*, the Court cannot conclude that Brown's entry into Refugio's home was unreasonable. *See Greiner*, 27 F.3d at 1354 ("Significantly, even after *Welsh*, the state courts in the jurisdiction where these arrests took place have approved warrantless home arrests for misdemeanors where justified by hot pursuit."); *see also Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("In order to determine whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, this Court's precedent, and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances."). Accordingly, Brown is entitled to qualified immunity on Refugio's illegal entry claim, and summary judgment in her favor is warranted.

*ii.     Excessive force*

The right to be free from excessive force is clearly established under the Fourth Amendment's prohibition against unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Guite*, 147 F.3d at 750. A court must nevertheless "make a fact-intensive inquiry in light of the specific context of the case to determine whether [an officer] is entitled to qualified immunity." *Rohrbough v. Hall*, 586 F.3d 582, 586-87 (8th Cir. 2009) (quotation marks omitted). "The dispositive inquiry is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Excessive force claims are analyzed under an "objective reasonableness standard." *Graham*, 490 U.S. at 388. The question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Whether an officer's use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct." *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990). In addition, courts may consider the result of the force in analyzing an excessive force claim. *See Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003); *Patzner*, 779 F.2d at 1371.

In this case, at the time Brown contacted Refugio, he did not present a threat to her safety or the safety of others. He had exited his vehicle, walked toward his home, and indicated no intent to return to his vehicle and continue driving. Further, Brown was attempting to arrest Refugio for a misdemeanor offense. Refugio responded to Brown's initial physical contact by

pulling his arm away from her and retreating into his home. Brown followed, jumping on

Refugio's back and kicking and hitting him. The degree of Refugio's resistance while in the

home is a fact issue. *See Rohrbough*, 586 F.3d at 587 ("Although [the plaintiff] returned the

officer's push, the severity of that reaction is a matter for the jury."). Additionally, a jury must

decide the extent of Refugio's injuries attributable to Brown. Although it appears that Ator,

Higgins, and Sullivan delivered several blows with their flashlights, they each contend that they

hit Refugio only in the arms and shoulders. A jury could thus find that Brown's punches and

kicks broke Refugio's ribs. Accordingly, viewing the facts in the light most favorable to

Refugio, the Court determines that a fact issue remains as to whether Brown used excessive force

against him. Additionally, the Court determines that it would have been clear to a reasonable

officer that pursuing a suspected misdemeanant into his home, jumping on his back, and

inflicting blows with enough force to break two of his ribs was excessive in light of the limited

seriousness of the suspected crime and the absence of an immediate threat to Brown or the

public. Therefore, the undisputed facts do not establish that Brown is entitled to qualified

immunity, and summary judgment is not warranted on this claim.

        *b.     Municipal liability*

       Refugio argues that the City and Harrington are liable under § 1983 for carrying out a

policy or widespread custom of using unreasonable and excessive force in its police tactics.

Municipalities and other local governmental entities can be sued under § 1983 only for the

entity's unconstitutional or illegal policies or customs. *Monell v. Dep't of Social Servs.*, 436

U.S. 658, 694 (1978). Commonly referred to as a *Monell* claim, a plaintiff must prove that a

municipal policy or custom was the "moving force of the constitutional violation" for a

municipality to be liable. *Id.* An official policy involves a deliberate choice to follow a course

of action made from among various alternatives by an official who has the final authority to establish policy. *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998). Alternatively, a "custom or usage" is demonstrated by: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; and (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct. *Id.*

Refugio has identified no City policy that was the moving force behind the alleged constitutional violations. Moreover, even if the City maintains a custom of using flashlights as "weapons of opportunity," there is no evidence that the custom was the moving force behind the alleged excessive force used by Brown. Indeed, it is undisputed that Brown did not use her flashlight in attempting to subdue Refugio. Accordingly, summary judgment in favor of the City and Harrington is appropriate on this claim.

### 2. *Conspiracy claim*

Refugio asserts that Brown and the other officers conspired to deprive him of the equal protection of the laws. Section 1985 prohibits "two or more persons" from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). To establish a conspiracy under § 1985, a plaintiff must show, among other things, that the defendants actually conspired. *See Barstad v. Murray County*, 420 F.3d 880, 887 (8th Cir. 2005). This "requires evidence of specific facts that show a 'meeting of minds' among conspirators." *Id.* (quoting *Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988)). Refugio argues that "the conduct of the police acting in concert" permits an inference that the officers conspired. This is incorrect. *Cf. Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 582 (8th Cir. 2006) (holding that joint pursuit of investigation by officers does not

alone support unlawful conspiracy under § 1983).  Moreover, Refugio has presented no evidence reflecting the officers' intent to discriminate against "Brown skinned and Latino-American persons."  Therefore, a reasonable jury could not conclude that Defendants conspired to deprive him of the equal protection of the laws, and summary judgment is warranted on this claim.

     *3.     State law claims*

Refugio argues that Brown and the City are liable to him for assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Isabel asserts that Brown and the City are liable to her for intentional and negligent infliction of emotional distress.

     *a.     Assault and battery*

Brown and the City argue that Refugio's assault and battery claims are barred by the doctrine of official immunity.  Official immunity is a common-law doctrine that provides public officials with a defense to state-law tort claims.  *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006).  Under Minnesota law, officials are generally entitled to official immunity unless the plaintiff shows either: (1) a ministerial duty is either not performed or is performed negligently; or (2) a willful or malicious wrong is committed.  *Schroeder v. St. Louis County*, 708 N.W.2d 497, 505 (Minn. 2006).  For purposes of official immunity, willful and malicious are synonymous and are defined as "the intentional doing of a wrongful act without legal justification or excuse."  *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).  To establish malice, a plaintiff must do more than allege malice; the plaintiff must present specific facts showing the officers intentionally acted wrongfully without legal justification or excuse.  *See Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. Ct. App. 1990).

For the reasons discussed above with respect to Brown's use of force against Refugio, the Court determines that a fact issue remains as to whether she acted willfully or maliciously.

Furthermore, the facts with respect to the use of force by Ator, Higgins, and Sullivan support a finding that they acted willfully or maliciously. According to Refugio, he was rendered unconscious in the bedroom and woke up outside of his home to officers putting pepper in his nose, placing their fingers in his nose, hitting him, and telling him to wake up. This evidence permits an inference that the officers continued to strike Refugio after he lost consciousness. Such conduct supports a finding of willfulness or malice.[13]

Brown and the City also argue that Refugio has failed to satisfy the elements for assault or battery. Under Minnesota law, an assault is an unlawful threat to do bodily harm to another with present ability to carry the threat into effect. *Elwood v. County of Rice*, 423 N.W.2d 671, 679 (Minn. 1988); *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939). A police officer may threaten to use reasonable force when making an arrest. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990) (citing Minn. Stat. § 609.06(1)(a) (1988)). A battery is an intentional unpermitted offensive contact with another. *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980). A battery claim against a police officer making an arrest is actionable only if the officer used "excessive force." *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984).

In this case, summary judgment is warranted on the assault claim because Refugio does not identify any particular threats to do bodily harm made by Brown, Ator, Higgins, or Sullivan. In contrast, for the reasons discussed above with respect to Brown's use of force, the Court determines that a fact issue remains as to whether she used excessive force in attempting to arrest

---

[13] The evidence of these officers' actions is relevant only insofar as it supports the City's vicarious liability. *See* Minn. Stat. § 466.02 (2008) ("[E]very municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function."); *Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999) (noting employer may be liable for employee's intentional misconduct when (1) the source of the attack related to employee's duties and (2) the assault occurred within work-related limits of time and place).

Refugio. Similarly, a fact issue remains as to whether Ator, Higgins, and Sullivan also used excessive force in arresting Refugio. The City does not argue that the officers were acting outside of the scope of their employment, and their actions thus support a finding of vicarious liability against the City for battery. *See* Minn. Stat. § 466.02; *Fahrendorff*, 597 N.W.2d at 910. Accordingly, summary judgment is not warranted on Refugio's claim for battery.[14]

<blockquote>
b. *Intentional and negligent infliction of emotional distress*
</blockquote>

Under Minnesota law, the tort of intentional infliction of emotional distress has four elements: (1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress was severe. *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). A claim for negligent infliction of emotional distress requires a plaintiff to show that (1) he was within a zone of danger of physical impact, (2) he reasonably feared for his safety, and (3) he suffered severe emotional distress with accompanying physical manifestations. *Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 408 (Minn. 1998). Severe emotional distress is distress that no reasonable person could be expected to endure. *Hubbard*, 330 N.W.2d at 439. A plaintiff bears a heavy burden of

---

[14]     Isabel argues that her "derivative loss of consortium claim remains viable" because a fact issue exists as to whether Refugio suffered a battery. *See Miskovich v. Indep. Sch. Dist. 318*, 226 F. Supp. 2d 990, 1000 n.1 (D. Minn. 2002) ("In Minnesota, a claim for loss of consortium is a derivative action and, therefore, does not exist independent of the injured spouse's right to maintain an action for the injuries sustained." (quotation marks omitted)). The Complaint, however, does not state a separate cause of action for loss of consortium but instead refers to loss of consortium only in the context of Isabel's injuries. *See State Farm Mut. Auto. Ins. Co. v. Isle*, 122 N.W.2d 36, 42 (Minn. 1963) (noting loss of consortium is an "independent cause of action"). Consequently, there is no claim for loss of consortium before the Court. Furthermore, even if Isabel had asserted a separate claim for loss of consortium, summary judgment would be warranted on the claim because she has directed the Court to no evidence of such loss. *See Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686, 695 (Minn. 1980) ("'Consortium' includes rights inherent in the marital relationship, such as comfort, companionship, and most importantly, sexual relationship.").

production regarding the severity of the mental distress. *Id.* Summary judgment is proper if a party fails to meet this high standard. *Jensen v. Walsh*, 609 N.W.2d 251, 253 (Minn. Ct. App. 2000), *rev'd on other grounds*, 623 N.W.2d 247 (Minn. 2001).

Refugio testified that the incident left him "very nervous," and Isabel testified that she suffered sleep loss and bouts of crying in the months following the incident. This level of emotional distress does not satisfy Plaintiffs' heavy burden of showing severe emotional distress. *See Peterson v. City of Plymouth*, 945 F.2d 1416, 1421 (8th Cir. 1991) (holding allegations of "illness, sleeplessness, humiliation, anxiety, mental anguish, and loss of reputation" insufficient to establish severe emotional distress under Minnesota law). Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' claims for intentional and negligent infliction of emotional distress.

## III.     CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiffs' Objection to Magistrate Judge's Order Denying Plaintiffs' Motion to Add Parties [Docket No. 53] is DENIED, and the magistrate judge's Order [Docket No. 50] is AFFIRMED.

2. Defendants' Motion for Summary Judgment [Docket No. 31] is GRANTED IN PART AND DENIED IN PART.

3. Summary judgment is GRANTED in favor of the four unknown and unnamed police officers, and the claims against them are DISMISSED WITHOUT PREJUDICE.

4. Summary judgment is GRANTED in favor of Harrington.

5. Summary judgment is GRANTED on Refugio's Fifth and Fourteenth Amendment substantive due process claim against Brown under § 1983.

6. Summary judgment is GRANTED on Refugio's Fourth Amendment illegal entry claim against Brown under § 1983.

7.  Summary judgment is DENIED on Refugio's Fourth Amendment excessive force claim against Brown under § 1983.

8.  Summary judgment is GRANTED on Refugio's municipal liability claim against the City and Harrington under § 1983.

9.  Summary judgment is GRANTED on Refugio's conspiracy claim under § 1985.

10. Summary judgment is GRANTED on Refugio's assault claim against Brown and the City.

11. Summary judgment is DENIED on Refugio's battery claim against Brown and the City.

12. Summary judgment is GRANTED on Plaintiffs' intentional infliction of emotional distress claims against Brown and the City.

13. Summary judgment is GRANTED on Plaintiffs' negligent infliction of emotional distress claims against Brown and the City.


Dated:  May 10, 2010

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge